UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| MARCELINO CLEMENTE, | No. 2:14-cv-0611 MCE KJN P |
|---|---|
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| T. PARCIASEPE, | |
| Defendant. | |

I. Introduction

Plaintiff is a state prisoner, proceeding without counsel. Plaintiff claims that defendant Parciasepe was deliberately indifferent to plaintiff's safety in violation of his Eighth Amendment rights.[1] Defendant's motion for summary judgment is before the court. As set forth more fully below, the undersigned finds that defendant's motion for summary judgment should be denied.

II. Plaintiff's Complaint

Plaintiff alleges that on January 10, 2013, defendant Parciasepe brought new inmate Villiers to plaintiff's cell, and when Villiers and plaintiff recognized each other as enemies from past encounters on the streets and prisons, they informed defendant, but defendant ignored their

---

[1] Plaintiff's First Amendment claims against defendant Parciasepe were dismissed without prejudice based on plaintiff's failure to exhaust his administrative remedies prior to bringing this action. (ECF Nos. 39, 43.)

1

1  pleas, shut the cell door, stated "handle your business," and walked away.  (ECF No. 1 at 8.)
2  Plaintiff alleges that Villiers started banging on the cell door, yelling "let me out because we [are]
3  not compatible," but their pleas went unanswered by defendant and the altercation continued.
4  (ECF No. 1 at 8.)  Plaintiff contends that defendant was deliberately indifferent to plaintiff's
5  safety, and failed to protect plaintiff, and claims that his failure to address their incompatibility
6  was cruel and unusual punishment.

7  III.  Defendant's Motion for Summary Judgment

8  Defendant moves for summary judgment on the grounds that there is evidence that
9  plaintiff staged the fight with Villiers so that plaintiff could get his old cellmate back, and there
10  are no facts demonstrating that defendant knew of an excessive risk to plaintiff or that defendant
11  disregarded any such risk.  In addition, defendant argues that he is entitled to qualified immunity
12  because it was reasonable for defendant to believe that his actions were lawful, based on his
13  review of the central files reflecting that plaintiff and Villiers were eligible to be cellmates,
14  neither inmate advised the officers they were enemies when Villiers was placed in cell 240,
15  that Villiers' statement that he and plaintiff were "incompatible," but both he and plaintiff were
16  calm, and showed no sign of aggression or fear, led defendant to believe that Villiers' request was
17  a convenience cell move request.  Defendant contends that his actions were objectively
18  reasonable in light of the information known to him at the time.

19  In opposition, plaintiff contends that his evidence demonstrates that defendant was warned
20  that Villiers and plaintiff viewed one another as enemies as soon as Villiers entered the cell.
21  Plaintiff argues that their yelling and kicking the door for help informed defendant that a fight
22  was going to ensue if defendant did not separate them.  Plaintiff contends that defendant ignored
23  these warnings, resulting in the altercation and subsequent injuries sustained by plaintiff and
24  Villiers.

25  In reply, defendant argues that Villiers' statement that he and plaintiff were
26  "incompatible" did not alert defendant to a substantial risk of harm or suggest that plaintiff and
27  Villiers were enemies.  Defendant contends that Villiers was placed in cell 240 without incident,
28  and it was not until shortly after they were celled together that Villiers informed defendant that

2

1  plaintiff and Villiers were "incompatible." (ECF No. 81 at 2.) Defendant argues that plaintiff
2  failed to adduce competent evidence that defendant was both aware of facts from which an
3  inference could be drawn that a substantial risk of harm existed, or that defendant drew the
4  inference. (ECF No. 81 at 3.) Defendant denies that plaintiff or Villiers told defendant any
5  reason they could not be housed together other than Villiers' statement that they were
6  "incompatible." Defendant states that he advised Villiers of the procedure for convenience
7  moves and assured him it would be addressed in the morning. Defendant contends that based on
8  his observations of the behavior of plaintiff and Villiers, Villiers' statements to defendant, and
9  defendant's experience and training as a correctional officer, defendant did not believe that
10 placing Villiers in cell 240 with plaintiff would lead to an altercation.

11    Moreover, defendant contends that plaintiff's statement in his opposition that he and
12 Villiers fought because plaintiff had "stabbed a person who plaintiff has always understood to be
13 Villiers' cousin" (ECF No. 80 at 4), is unsupported by plaintiff's own declaration or any other
14 competent evidence. (ECF No. 81 at 4.) Defendant points out that Villiers testified at his
15 deposition that plaintiff fabricated the story about the cousin to create a reason for the fight that
16 plaintiff planned in order to get Villiers out of the cell that night. (Id.) Defendant notes that
17 plaintiff did not deny that he orchestrated the fight.

18    Defendant argues that he adduced evidence that plaintiff and Villiers had no problems
19 previously, and after the fight, they signed a "peaceful Co-existence Agreement" chrono which
20 conceded that there was no animosity between them and they could co-exist peacefully on the
21 same prison yard. Moreover, months after the incident they continued to be housed in the same
22 building, "and communicated with each other with no signs of hostility, no verbal or physical
23 altercations between them." (ECF No. 81 at 5.)

24    Finally, defendant argues that he is entitled to qualified immunity because he believed in
25 good faith that his actions were reasonable based on the circumstances as he knew them at the
26 time. (ECF No. 81 at 6.)
27 ////
28 ////

3

IV. Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party

1 must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
2 of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
3 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.
4 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return
5 a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436
6 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d
7 1564, 1575 (9th Cir. 1990).

8 In the endeavor to establish the existence of a factual dispute, the opposing party need not
9 establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual
10 dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
11 trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce
12 the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
13 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
14 amendments).

15 In resolving a summary judgment motion, the court examines the pleadings, depositions,
16 answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R.
17 Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at
18 255. All reasonable inferences that may be drawn from the facts placed before the court must be
19 drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences
20 are not drawn out of the air, and it is the opposing party's obligation to produce a factual
21 predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F.
22 Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to
23 demonstrate a genuine issue, the opposing party "must do more than simply show that there is
24 some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could
25 not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for
26 trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

27 By contemporaneous notice provided on November 10, 2015 (ECF No. 75-1), plaintiff
28 was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

5

Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

V. Evidentiary Objections

Defendants filed objections to plaintiff's exhibits. Generally, this court does not rule on evidentiary matters raised on summary judgment, unless otherwise noted. See Capitol Records, LLC v. BlueBeat, Inc., 765 F.Supp.2d 1198, 1200 n.1 (C.D. Cal. 2010) (stating that it is often unnecessary and impractical for a court to methodically scrutinize and give a full analysis of each evidentiary objection on a motion for summary judgment); Burch v. Regents of the Univ. of Cal., 433 F.Supp.2d 1110, 1118-22 (E.D. Cal. 2006) (same).

"At summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial." Nevada Dep't of Corr. v. Greene, 648 F.3d 1014, 1019 (9th Cir. 2011) (citing Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001)) (internal quotations omitted). The focus is on the admissibility of the evidence's contents, not its form. Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004); Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Burch, 433 F.Supp.2d at 1122. Therefore, unless otherwise specifically addressed herein, defendants' authentication and hearsay objections are overruled. See, e.g., Fonseca, 374 F.3d at 846; Burch, 433 F.Supp.2d at 1122. Documents submitted as exhibits are considered to the extent that they are relevant, and despite the fact that they are not authenticated because such documents could be admissible at trial if authenticated. This court offers no opinion on the admissibility of these documents at trial.

VI. Facts[2]

On January 10, 2013, plaintiff Marcelino Clemente was housed in A-5 facility of Mule Creek State Prison ("MCSP") and did not have a cellmate at that time. Defendant Correctional Officer Parciasepe and his partner, Correctional Officer S. Hpoo ("Hpoo"), worked the third watch shift from 1400 to 2200 hours. That night, MCSP received prisoners at the facility who had just transferred in from another prison, including inmate Eric Villiers, CDCR # D-96687

---

[2] For purposes of the pending motion, the following facts are found undisputed, unless otherwise indicated.

6

1   ("Villiers").  Control Sergeant Butcher assigned defendant the task of locating housing for new
2   arrival Villiers.
3       An appropriate housing assignment for an inmate is determined through a screening
4   process pursuant to California Code of Regulations Title 15 § 3269(a).  A number of factors are
5   considered when determining an appropriate housing assignment, including the inmate's CDCR
6   Form 812, also known as an "Enemy List" which is reviewed to confirm that inmates are not
7   listed as enemies before housing them together.  If an inmate has another inmate on his "Enemy
8   List," those inmates would not be housed in the same cell, nor would they be housed in the same
9   building.
10      It is not uncommon for inmates to decide that they are not compatible and do not wish
11  to be celled together, or prefer to be housed with another inmate.  These inmate-initiated requests
12  are known as convenience cell move requests, and at MCSP the inmate could submit a written
13  Request for Cell Move, MCSP Form 0427, and request that he be given a new housing
14  assignment.  However, under the California Code of Regulations Title 15 Section 3269, inmates
15  are not permitted to choose their own cellmate ("Inmates shall accept Inmate Housing
16  Assignments (IHA) as directed by staff"), and inmate-requested convenience moves are made at
17  the discretion of the prison staff.
18      On January 10, 2013, defendant reviewed Villiers' central file records, including his
19  "enemy list" (CDCR Form 812); defendant confirmed that plaintiff was not an enemy of Villiers
20  on Villiers' CDCR Form 812.  Defendant also reviewed plaintiff's central file records, including
21  plaintiff's "Enemy List"; defendant confirmed that Villiers was not an enemy of plaintiff on
22  plaintiff's CDCR Form 812.  Defendant noted that plaintiff's Integrated Housing Code ("IHC")
23  indicated that plaintiff could only be housed with someone of the same race category; defendant
24  confirmed that Villiers and plaintiff were listed as the same race category, "O" for "other."[3]

---

25  [3] Plaintiff objects that he and Villiers are not of the same race category because plaintiff is Puerto
26  Rican and Villiers is Cuban.  Defendants point out that plaintiff provided no evidence to support
    such objection, and failed to demonstrate personal knowledge as to the race "categories" used by
27  the CDCR.  In the operative pleading, plaintiff did not contend that he and Villiers got into a fight
    because they are of different races, or that they should not have been celled together because of
28  their different races.  (ECF No. 1, *passim*; Pl.'s Depo. at 18-20.)  Moreover, defendant adduced

1 Defendant also reviewed other case factors in plaintiff's and Villiers' central file records, including their commitment offenses, classification scores, and ages, using the Electronic Records Management System ("ERMS"). Based upon all the information available to defendant, Villiers and plaintiff appeared eligible as cellmates given the criteria under Title 15 § 3269.

At approximately 2050 hours, defendant and Hpoo escorted Villiers to cell 240 in Building A-5 to be housed with plaintiff. When defendant and Hpoo placed Villiers in the cell with plaintiff, Villiers entered the cell without incident, and before the cell door closed, neither inmate stated to defendant or Hpoo that they were enemies or could not be housed together.[4] Plaintiff avers that after the cell door closed, he and Villiers recognized each other "as enemies from past conflicts" (ECF No. 80 at 21); defendant and Hpoo aver that greetings were exchanged when Villiers was placed in cell 240 (ECF Nos. 75-2 at 40, 47).

It is undisputed that at some point after the cell door closed, Villiers told defendant that Villiers and plaintiff were "incompatible," or "not compatible." The parties dispute the additional specifics of what took place after the cell door closed, but shortly thereafter, plaintiff and Villiers engaged in an altercation.

Upon their return to cell 240, defendant and Hpoo observed Villiers and plaintiff had visible injuries and abrasions as if they had struck one another. Defendant and Hpoo immediately separated Villiers and plaintiff, handcuffing and placing them in separate areas of the building, and began to investigate what had occurred between them. Defendant and Hpoo contacted medical staff to evaluate Villiers and plaintiff for any injuries. Defendant prepared Rules Violation Reports (CDC Form 115) for plaintiff and Villiers documenting the incident.

////

---

the following evidence: Plaintiff's IHC was designated as "RO," or "restricted to own race," and Villiers' IHC was "RE," or "racially eligible," meaning he could be housed with an inmate of any race. Villiers testified that he is Puerto Rican and Cuban. (Villiers' Depo. at 18.) Under CDCR policy, because both plaintiff and Villiers were listed as an "O" race category, they could be celled together. Plaintiff adduced no evidence in rebuttal.

[4] Plaintiff objects that defendant put Villiers into the cell without questioning either inmate as to whether they were compatible. However, plaintiff points to no policy requiring correctional officers to make such an inquiry.

During his deposition, Villiers testified that he had prior interactions with plaintiff around 2007 or 2008 on the yard. (Villiers' Depo. at 16-18.) Villiers had seen and spoken with plaintiff during that period, had no problems with plaintiff, and nothing was said about an inmate Duran who allegedly was stabbed by plaintiff.[5] (Id. at 17-18.)

## VII. Alleged Deliberate Indifference to Plaintiff's Safety

### A. Contentions

Defendant contends, inter alia, that he was not deliberately indifferent to plaintiff's safety needs because there was no record that plaintiff and Villiers were enemies prior to Villiers' placement in cell 240, and that Villiers did not inform defendant that Villiers and plaintiff were enemies; rather, Villiers simply objected that they were not compatible. Indeed, defendant points out that in Villiers' deposition he testified that he never informed any officer on January 10, 2013, that Villiers and plaintiff were enemies, and now claims that plaintiff staged the fight so that plaintiff could get his old cellmate back.

Plaintiff claims that Villiers informed defendant that Villiers and plaintiff could not live together because they had conflicts from the past, and failed to timely respond once plaintiff and Villiers engaged in an altercation, despite various inmates telling defendant about the altercation.

### B. Eighth Amendment Standards

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners. Farmer v. Brennan, 511 U.S. 825, 832 (1994). In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. Id. at 833; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005). The failure of prison officials to protect prisoners from attacks by fellow prisoners or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is, subjectively, deliberately indifferent to prisoner safety. Farmer, 511 U.S. at 834; Hearns, 413 F.3d at 1040-41. For a prison official to be held liable under the Eighth Amendment, the official "must know[ ] of and

---

[5] Plaintiff objects to Villiers' statement, but does not adduce evidence as to the 2007 or 2008 timeframe, or to the prior interactions with Villiers.

9

disregard[ ] an excessive risk to prisoner health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1187-88 (9th Cir. 2002) (same).

The party claiming an Eighth Amendment violation "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842 (citation omitted). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

The Supreme Court further explained that the "obviousness of a risk" is not conclusive, and a prison official may demonstrate that the obvious escaped him. Farmer, 511 U.S. at 843, n.8 (citation omitted). But a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. . . ." Id. Also, a prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Id. at 844. The ultimate test is whether the prison official acted reasonably in light of his knowledge; if he did, he is not liable under the Eighth Amendment even if the prisoner is harmed. Id.

C. Discussion

It is undisputed that defendant was unaware of any enemy concerns between plaintiff and Villiers prior to placing Villiers in plaintiff's cell on January 10, 2013,[6] and up until the cell door closed. However, there are material disputes of fact as to what occurred once the cell door closed. Defendant and Hpoo both provide declarations stating that neither inmate stated that they

---

[6] Indeed, in his deposition, plaintiff testified that he never lists his enemies on his Form 812 in his central file. (Pl.'s Depo. at 63-64.)

were enemies or that they could not be housed together; rather, they aver that Villiers only claimed he was incompatible with plaintiff.  In addition, both defendant and Hpoo aver that they were busy with other prison duties, and that banging on cell doors was common.

On the other hand, plaintiff provides his own declaration, and that of other inmates, claiming that defendant was told that Villiers and plaintiff could not live together, that Villiers told defendant that plaintiff and Villiers had conflicts in the past, and that despite various inmates informing defendant that plaintiff and Villiers were engaged in an altercation, defendant did not sound an alarm or immediately proceed to cell 240.

For example, in his declaration dated January 6, 2016, inmate Alcantar declared that the new arrival inmate (Villiers) informed defendant that he could not live in cell 240, and that after Villiers started kicking the door, defendant ignored the situation.  (ECF No. 80 at 56.)  Inmate Alcantar stated that Villiers and plaintiff fought for at least 10 minutes before Hpoo told defendant "let's break that fight up," but defendant responded, "not yet."  (ECF No. 80 at 56.)  Inmate Alcantar witnessed this conversation while he was in the dayroom in the pill line.  (ECF No. 80 at 57.)

In his declaration dated May 28, 2014, inmate Batiste stated that he witnessed plaintiff being attacked by "his cellmate," and notified defendant who responded, "it wasn't his problem." (ECF No. 80 at 52.)  Inmate Batiste also states that despite protocol requiring that an alarm be activated during an altercation, no alarm was sounded.  (Id.)

On June 20, 2014, inmate Guzman signed a declaration stating that he witnessed defendant bring a new arrival inmate to cell 240, and "upon entering" he observed and heard the new arrival tell defendant that the new arrival could not be housed with plaintiff "because of a past enemy situation and that they were not compatible."  (ECF No. 80 at 71.)  Defendant walked off, and inmate Guzman heard banging and yelling for help coming out of cell 240.  (Id.)  Inmate Guzman states that defendant sat at the podium, and the altercation went on for over 20 minutes before defendant responded.  (Id.)

In a declaration dated November 5, 2014, inmate Smith testified that he witnessed two inmates fighting in cell 240, but that defendant and other officers "just sat at their post in the

11

middle of the dayroom and refuse[d] to respond." (ECF No. 80 at 65.) Despite defendant being informed of the incident by inmates and psych techs Island and Tabor, defendant ignored them and "allowed these inmates to harm each other." (ECF No. 80 at 65.)

In a declaration dated May 30, 2014, inmate Rush stated that during med call he heard his "next door neighbor tell Officer Parciasepe he wanted out of 5-240 because him and inmate Clemente were uncompatible [sic]." (ECF No. 80 at 45.) Rush said defendant responded, "too bad," and then walked away. (Id.) Rush's cell door opened, he stepped out and saw "the guy that just moved in swing at" plaintiff. (Id.) Rush told defendant these inmates were fighting and defendant responded, "oh, well." (Id.)

In an affidavit[7] dated September 5, 2014, inmate Johnson states that on January 10, 2013, he heard the "new arrival inmate shouting that he could not be housed in cell 240 because he recognized the occupant (inmate Clemente) as an enemy and that they would not be compatible." (ECF No. 80 at 54.) Inmate Johnson states that he could hear calls and pleas for help, and saw defendant "ignore those inmates as well as the ongoing screams and cries and remained seated at his post smiling." (ECF No. 80 at 54.)

In his declaration, dated May 26, 2015, inmate Garcia[8] initially heard Villiers tell defendant that Villiers was incompatible with plaintiff; when defendant returned with a mattress, he heard Villiers tell defendant that he could not live with plaintiff. After Villiers started kicking

---

[7] Defendant objects that inmate Johnson's affidavit is not based upon personal knowledge, information, and belief. (ECF No. 80 at 54.) However, the document is entitled "affidavit," and inmate Johnson states that he swears the "within true and correct under penalty of perjury based upon personal knowledge, information, and belief." (ECF No. 80 at 54.) Any such evidentiary issue can be resolved at trial; inmate Johnson is an alleged eye and ear-witness to the events of January 10, 2013.

[8] Defendant objects that plaintiff failed to disclose Garcia's declaration in discovery. Although plaintiff obtained Garcia's declaration after the close of discovery, plaintiff was under a continuing obligation to supplement discovery responses in a timely manner. Fed. R. Civ. P. 26(e)(1)(A). The record reflects that defendants were provided a copy of Garcia's declaration by electronic filing on August 5, 2015. (ECF No. 64 at 36.) Thus, it does not appear that defendants were unduly prejudiced by such delay in providing Garcia's declaration. However, even if the court excluded Garcia's declaration for purposes of summary judgment, the outcome would not change in light of the other declarations provided by plaintiff.

12

1  the door, inmate Garcia heard Villiers yelling that he and plaintiff were not compatible and were
2  enemies. (ECF No. 80 at 62-63.)
3        Defendant declares that "at no time during Villiers' placement into the cell did he or
4  [plaintiff] state to [him] that they were enemies or could not be housed together," (ECF No. 75-2
5  at 47), and later Villiers told defendant and Hpoo that he "did not want to live with this dude,
6  we're incompatible" (ECF No. 75-2 at 48). However, in the RVR written by defendant after the
7  altercation, defendant wrote that shortly after the cell door closed, Villiers started yelling, "I can't
8  live with this guy. We are not compatible!" (ECF No. 75-2 at 58.)
9        Viewing the evidence in the light most favorable to plaintiff, plaintiff adduces evidence
10 that Villiers told defendant and Hpoo that plaintiff and Villiers could not live together, and there
11 are declarations from inmates who testify that they heard Villiers yell for help, and saw defendant
12 ignore the cries for help for periods ranging from 10 to 20 minutes. Thus, there are material
13 disputes of fact as to whether defendant was deliberately indifferent to plaintiff's safety. In other
14 words, if the jury finds such statements were made and heard by defendant, a reasonable jury
15 could find that defendant was deliberately indifferent to plaintiff's safety on January 10, 2013,
16 either after the cell door closed and Villiers told defendant that Villiers and defendant could not
17 live together, or during the altercation, or both.
18       Defendants also provided the declaration of Lt. Baldwin, who interviewed both plaintiff
19 and Villiers following the incident. Lt. Baldwin avers that both plaintiff and Villiers told Baldwin
20 after the incident that they were not enemies. (ECF No. 75-2 at 78.) Defendants argue that
21 plaintiff failed to expressly deny that he told Baldwin that Villiers and plaintiff were not enemies.
22 However, in plaintiff's declaration, he states that after the incident, the lieutenant asked whether
23 they would be able to keep from fighting so long as they were not in the same cell. (ECF No. 22.)
24 Plaintiff avers that he and Villiers "agreed to not fight." (ECF No. 22.) Plaintiff explained that
25 they then signed a "peaceful coexistence agreement" chrono so that they would not be placed "in
26 the hole." (ECF No. 23.) Plaintiff states that the chrono does not say that he and Villiers are not
27 enemies, or that they were never enemies, it just says that they declare that there exists no
28 animosity or ill feelings between them. (ECF No. 23.) While this appears to be a parsing of

13

words, and plaintiff did not expressly deny telling Baldwin that plaintiff and Villiers were not enemies, it does not change the court's evaluation of the facts set forth above. Whether or not plaintiff and Villiers were or are actually enemies is of no consequence where plaintiff adduced evidence that Villiers told defendant that Villiers and plaintiff could not live together. It appears that while a statement that cellmates are incompatible may rise only to the level of a request for a move of convenience, and a statement that cellmates are enemies is cause for immediate separation, a claim that inmates cannot live together could warrant immediate separation if sufficient additional facts so demonstrated. For example, if Villiers' escalated his concerns with defendant each time defendant returned to the cell, or if Villiers later yelled out and explained a past conflict with plaintiff that could be viewed as an enemy situation, a rational jury could find that the failure of defendant to separate these cellmates posed a substantial risk of harm to plaintiff.

Finally, defendant makes much of Villiers' deposition testimony that plaintiff allegedly staged the altercation so that he could get his old cellmate back, and now denies that on January 10, 2013, after he was placed in the cell with plaintiff, that he ever informed the officers that Villiers and plaintiff were enemies. (Villiers' Depo. at 11-16; 16.) However, plaintiff provided a declaration from Villiers, dated May 24, 2014, in which he declared that defendant promised Villiers privileges if Villiers would lie for defendant "and say that the incident between [Villiers] and [plaintiff] didn't happen the way that [plaintiff] is trying to say." (ECF No. 80 at 34.) In addition, during Villiers' deposition, he testified that plaintiff told Villiers about Duran (the purported cousin) not when Villiers entered cell 240, but after the January 10, 2013 incident, "so that [plaintiff] can file for the lawsuit." (Villiers' Depo. at 12-13.) Villiers testified plaintiff told Villiers "like a week after" the incident. (Id.) In addition, plaintiff provided an undated declaration, signed by Villiers, in which he avers that on January 10, 2013:

> I observed inmate Clemente one of my enemies from my past, at which time I told the C/O that I couldn't program in the same cell with this person. C/O Parcesepe [sic] ignored me and walked off. I started to yell that I couldn't live with Clemente, by this time I began to kick the door in fear of my life (for my safety). Upon returning with a mattress I again informed C/O Percesepe [sic] that this inmate was a long time enemy that we weren't compatible.

14

> Instead, he ignored the situation and stated, [w]ell then, "handle your business," and walked away creating a hostile and dangerous situation forcing me to get into a fight with Inmate Clemente. C/O Parcesepe [sic] was aware of this and ignored my safety. He took no action. . . .

(ECF No. 80 at 33.)[9] Plaintiff also provided a declaration by inmate Suarez, dated January 4, 2016, in which he claims that he witnessed defendant talk to Villiers a number of times around 2013 and 2014, when Villiers told Suarez that defendant had approached Villiers about testifying for defendant. (ECF No. 80 at 60.)

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted).

Because Villiers appears to offer conflicting testimony concerning what took place on January 10, 2013, his testimony is not taken into consideration herein. The court must draw all inferences in the light most favorable to the plaintiff and determine whether a genuine issue of material fact precludes entry of judgment. As set forth above, plaintiff has adduced evidence demonstrating that there are genuine issues of material fact that preclude entry of judgment, whether or not the court considers Villiers' testimony.

VIII. Qualified Immunity

Defendant argues that he is entitled to qualified immunity because a reasonable officer in his position would not have believed that Villiers' statement that he and plaintiff were "incompatible" placed plaintiff at a substantial risk of harm. (ECF No. 75 at 26.) At the most, defendant contends that his conduct could be construed as a reasonable, but mistaken, judgment, which is subject to qualified immunity. (Id.)

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments. . . . When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting

---

[9] The RVR written by defendant after the January 10, 2013 incident, states: "VILLIERS stated on his 7219 Medical Evaluation conducted by LPT Island, and I quote, 'We are enemies; we can't live together. We just got in a fight.'" (ECF No. 75-2 at 58.) During interviews following the incident, both plaintiff and Villiers claimed they are enemies. (ECF No. 80 at 28-29.)

1  Malley v. Briggs, 475 U.S. 335, 341 (1986)).  In deciding whether a government official is
2  entitled to qualified immunity, the Supreme Court has articulated a two-prong approach:  first,
3  whether the officer's conduct violated a constitutional right; and second, whether the officer's
4  conduct violated "clearly established law."  Pearson v. Callahan, 555 U.S. 223, 232, 243-44
5  (2009) ("The principles of qualified immunity shield an officer from personal liability when an
6  officer reasonably believes that his or her conduct complies with the law.").  "[J]udges of the
7  district courts . . . [are] permitted to exercise their sound discretion in deciding which of the two
8  prongs of the qualified immunity analysis should be addressed first."  Id. at 236.

9  In the Eighth Amendment deliberate indifference context, the Ninth Circuit has clarified
10 that "the qualified immunity inquiry is separate from the constitutional inquiry."  Estate of Ford v.
11 Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).  To survive a motion for summary
12 judgment asserting qualified immunity on a "deliberate indifference claim," a prisoner plaintiff
13 must present sufficient evidence that "a reasonable officer" in defendants' position "would
14 necessarily have perceived . . . an excessive risk of serious harm."  Id. at 1051 (citing Saucier v.
15 Katz, 533 U.S. 194, 202 (2001)).  "[A] reasonable prison official understanding that he cannot
16 recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly,
17 but reasonably, perceive that the exposure in any given situation was not that high," in which
18 case, "he would be entitled to qualified immunity."  Estate of Ford, at 1050.

19 Generally, a prison official's housing decision does not violate the Eighth Amendment
20 merely because it increases the risk of harm to a prisoner; the decision is unconstitutionally
21 deliberately indifferent only if "the risk of harm from" the decision to house an inmate with other
22 dangerous inmates "changes from being a risk of some harm to a substantial risk of serious
23 harm."  Estate of Ford, 301 F.3d at 1051.  Further, a prison official is entitled to qualified
24 immunity for harm that arises from a housing decision if "a reasonable officer in [the defendant's]
25 position" would not have known that the decision "posed an excessive or intolerable risk of
26 serious injury."  Id. at 1052[10] (citing Farmer, 511 U.S. at 847 n.9).

---

[10] In Estate of Ford, the family and estate of an inmate who was killed by his cellmate brought a failure-to-protect claim against the prison officials, arguing their decision to house the decedent

1        Under these standards, defendant is entitled to qualified immunity from liability unless a reasonable officer in his position with the information he had would have perceived a substantial risk of harm to plaintiff from retaining Villiers in cell 240 on January 10, 2013.  Thus, defendant is not entitled to qualified immunity because there are material disputes of fact as to the information defendant had once the cell door closed.  Viewing the evidence in the light most favorable to plaintiff, in 2013, a reasonable prison official would have known that leaving an inmate in a cell where Villiers is yelling that he cannot live with this guy, or explained that the inmates "had conflicts from the past," (ECF No. 80 at 22), or told defendant about plaintiff and Villiers' "past enemy situation" (ECF No. 80 at 71), placed those inmates at substantial risk of harm.  The evidence adduced by plaintiff raises material disputes of fact as to whether defendant was subjectively aware that plaintiff was at substantial risk of harm.  Thus, defendant is not entitled to qualified immunity.  See Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the [defendant's] entitlement to qualified immunity depends on the resolution of disputed issues of fact in [the defendant's] favor, and against the non-moving party, summary judgment is not appropriate."), cert. denied, 543 U.S. 811 (2004) (citation omitted).  "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is 'a question of fact best resolved by a jury.'" Torres v. City of Madera, 648 F.3d 1119 (9th Cir. 2011), quoting Wilkins, 350 F.3d at 955.

---

with a known "predator" was deliberately indifferent.  Id., 301 F.3d at 1047.  The cellmate in Estate of Ford, Diesso, was "characterized as 'extremely violent and dangerous,'" was involved in a number of attacks on guards and other inmates, "was designated a 'predator,'" he "often requested to be celled with known homosexuals," and "wanted to cell with Ford but [prison officials initially] did not allow it to happen." Id. at 1046.  The decedent, Ford, was "widely known to [prison] staff as an effeminate homosexual," but was not "classified as a 'victim.'"  Id. at 1046-47.  Two weeks before Ford was transferred to Diesso's cell, Diesso was observed behaving strangely and was prescribed temporary medication.  Ford was transferred to Diesso's cell, and, two days later, Diesso attacked and killed Ford.  Id. at 1047.  The district court concluded that genuine issues of material fact precluded summary judgment whether defendants were deliberately indifferent to a substantial risk of harm to Ford, and denied qualified immunity; the Ninth Circuit reversed.  Id. at 1048, 1051-53.  The court concluded the prison officials were entitled to qualified immunity:  "Although [defendants'] decision[s] to . . . allow Diesso to be double-celled with Ford turned out to be quite unfortunate . . ., we cannot say that a reasonable correctional officer would have clearly understood that the risk of serious harm was so high that he should not have authorized the double-celling."  Id. at 1051.

Because a genuine issue of fact exists regarding whether defendant was deliberately indifferent to plaintiff's safety by leaving Villiers in plaintiff's cell, defendant is not entitled to summary judgment on the issue of qualified immunity. The parties offer competing versions of events, but accepting plaintiff's version of events as true, the duty to protect him from harm from other inmates had long been established by 2013, and no reasonable officer could have believed that it was appropriate to retain an inmate in a cell where the inmate stated he could not live with his cellmate or had a prior enemy situation with such cellmate, or was engaged in a physical altercation with the cellmate. Farmer, 511 U.S. at 832-33; Hearns, 413 F.3d at 1040; Leer v. Murphy, 844 F.2d 628, 633-34 (9th Cir. 1988).

IX. Conclusion

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment (ECF No. 75) be denied; and

2. This matter be remanded to the undersigned for further scheduling.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 19, 2016

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/clem0611.msj